You may proceed. Thank you. May it please the Court. This case is an appeal of dismissal of antitrust claims under Rule 12b-6, prior to any discovery of the antitrust claims. The claims were well-pledged, tracking the language of professional real estate and the Supreme Court case in California Motor Transport, alleging sham litigation and automatic petitioning. Can I ask you a question? If you look at your briefs, there's nothing in your briefs that cites to a case that says PRE applies to maintenance of litigation. In other words, under PRE, if the initiation of litigation is sham, then there is a cause of action under the antitrust laws. But what case law do you rely on to support the proposition that you can maintain an action under the antitrust laws for maintenance of litigation, if at some later point in time there is information that's brought to light? Well, Your Honor, certainly the same principle applies, but let me make clear. This dismissal was prior to any discovery. It is our position that at the very least, by the time the Southern District of New York and the Federal Circuit had told AstraZeneca that the theories it was pursuing were not valid theories under these very same patents, that happened in 2002 and 2003, and by 2003 AstraZeneca had samples of, let me tell you what they had. I still want to answer my question. So there's lots of things that can deal with vexatious maintenance of litigation, such as 28 U.S.C. 1927, Rule 11, extraordinary case determinations. Are the antitrust laws designed to deal with that issue if at the time of filing it was not objectively baseless? We can get to your debate as to whether it was objectively baseless at the time of filing. I want to know what law you rely on for that proposition. Well, certainly I can go back to basic conspiracy law. This is not a single-party activity. This was a litigation that was maintained by AstraZeneca entities, Merck entities. They were also in contractual relationships with Procter & Gamble and others, and they were protecting the market, and we have well-plaid counts alleging a conspiracy under the antitrust laws of these entities. Can you cite me to a case on these facts that under the antitrust laws addresses maintenance of litigation? I mean, if you can't, you can't. I don't see it. It's not in your briefs, and so I wanted to know what you're relying on. There's certainly nothing in our brief that specifically addresses that point. I don't believe AstraZeneca has challenged that point. There's certainly nothing in professional real estate that would indicate that once a litigant knows that they have a baseless litigation, that they can go full speed ahead willy-nilly. Well, PRE's quote, existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation. So did it really mean what it said, or was it only using that language because it was addressing the actual institution? Those were the facts at hand. I might add, Your Honor, that in 2003 AstraZeneca amended its complaint, re-alleging all the charges against Mylan, and charging laboratories Dr. Stubbe, Mylan's manufacturing partner. So the chronology here, and if we have discovery, we may find from the get-go they knew it was baseless. Look at what was motivating them here. They were protecting a $6 billion a year market. They sued each and every attempted entrant into that market for patent infringement. And they won eight out of the 11, right? That's correct. They lost three that did not have alkaline reacting compounds. So what is the relevant market you're alleging? Is it just the market for Ilicec? What's the market? Well, I think in our complaint we say it's either a Meprizole and or a Meprizole and does a Meprizole, which is Nexium. Okay. So it's essentially a single product or the substitution for that product that the same company came up with. That's correct. In fact, it's not really a substitution. The Nexium is the enantiomer of the racemate Meprizole. Mr. Wallace, the statute makes the filing of a paragraph 4 certification a statutory infringement, if you will. The statute actually uses that term. On that basis, isn't it objectively reasonable to sue for an infringement which is established as such by statute? It may or may not be, depending on what the plaintiff knew at the time they filed the suit. Your Honor's got to recognize that this was part of a global litigation, literally hundreds of suits. I like your answer. It depends on what they knew. But, of course, they wouldn't even have the product to test it and find out if it had an arc or not until you sue them. You'd have to, as triggered by the statutory infringement, you'd have to sue because there's time limits clicking. Remember, you lose everything if you don't. You'd have to sue, and then you could get into discovery and find out if they have an arc or not. And eight of them did, but three didn't, as you pointed out. Well, bear in mind, Your Honor, the pellets that were the subject of the Myelin anda were made by laboratories Dr. Esteva. And they were identical to some of the foreign pellets and quite similar to some of the foreign pellets that AstraZeneca was litigating around the world. So this is a very unusual ANDA situation. It may well be that if you didn't have all this other activity, that in an abundance of caution, perhaps you would say, well, they don't know, they've got to do something. But they were litigating around the world. They knew more about our product than… When you get into that context, don't you then also have to deal with the experts that are saying that T, T-E-A, is an arc, effectively an arc? Well, that's an interesting question, Your Honor, because… And one of their big defenses is they defeated the Myelin-Esteva summary judgment of non-infringement. And, of course, we cite the Film Tech case and we cite the Callaway case from Second Circuit and Federal Circuit. What they promised Judge Jones in presenting her with all the material opposing the summary judgment, they said, Your Honor, all of these things may be true. We heard what Judge Jones said in 2002. We heard what the Federal Circuit said in 2003. But we have a new theory under doctrine of equivalence, and we need to go to trial under doctrine of equivalence. Now, in writing her opinion finding non-infringement, Judge Jones basically reprimanded them because they didn't present any new evidence. It was a sham to keep the litigation going trying to protect their market. But wouldn't Judge Jones be the person in the best position to make that determination? I mean, this just wasn't one litigation. This was in the context of a 1407 MDL. I mean, she had almost as much familiarity with these products and these lawsuits as anybody else in the entire courtroom. I will agree. She had more familiarity with these products and the infringement issues and the validity issues than anybody else in this courtroom other than Mr. Taylor, perhaps. And she got it right on the infringement issues. But we're talking about the antitrust issues. She did not have a factual hearing on the antitrust issues. We did not have discovery on the antitrust issues. So you're arguing that she erred procedurally. She shouldn't have granted this on 12B6. And what you really want, if I understand it right, is a shot at maybe some discovery. You would agree that if she had done this under 56, after discovery it would be much tougher. You'd have to be really in a much more difficult situation. No, I think I would be in a much better situation because I would know what AstraZeneca knew, and I would have been able to file a Rule 56 affidavit indicating their disputed issues, and we need to have a jury trial. AstraZeneca doesn't have to waive attorney-client privilege as part of this. Discovery doesn't get you beyond the attorney-client privilege. And if I understand it right, what you really want from them is things they claim are attorney-client privilege. Isn't that right? Well, that's not quite right. It's a test ordered by the attorneys in advance when they were deciding whether to file a lawsuit or not. And what AstraZeneca knew as it was maintaining the lawsuit. Well, that's the maintenance issue. Let's stick with your filing issue for now. So I guess, I don't know. Judge Jones seems to have been in such a good and knowledgeable position on this case, and it seems quite clear to me that if we were to give you what you asked for, she's going to reach the same conclusion. It's just going to cost all the clients a lot more money to get there. So I don't know what the point is. No, with all respect, Your Honor, if we have our discovery, we will have factual issues that need to go to the jury, and we will have a jury trial. What's the discovery? I mean, assuming that you converted this to a Rule 56, why couldn't she have just said, I'm going to consider all of these things that I'm considering, but I don't think there's any basis for former discovery. That would be a discretionary determination on her part. Well, there's certainly basis to know what Astra knew about our product and when they knew about it. It's very interesting, Your Honor. Not one shred of evidence was presented in a three-month trial showing that the finished product sold by Myelin contained an alkaline-reacting compound. They had the most sophisticated technology to measure for the presence of an alkaline-reacting compound in the world. They used it for other defendants. They did not offer any evidence in the Myelin Esteva case. But isn't the question an objective inquiry? It sounds like you're asking for something much more subjective. Well, no. It's whether, based on the facts that are at hand for the plaintiff, did they have an objective basis for instituting and or maintaining the litigation. Well, you didn't give them the samples until 2003, right? We gave them the samples three years before the trial. That's correct, Your Honor. Okay, but after the action was instituted. That's true. Because the case, if I may give you a little background, because there was the first wave case which went to trial, discovery in our case was state for a couple of years. You allege on the face of your complaint, you just say, on information and belief, we think that once they tested those samples, they knew something. How is that enough for Twombly? How is that enough what? How is that enough to satisfy Twombly? Well, it's certainly a plausible theory, Your Honor, considering they were introducing evidence as to co-defendants' products. They had three years to test our products, our final finished products, and they did not offer one shred of evidence to show there was an alkaline reacting compound. But you didn't allege what the test results showed when you were able to test the same types of samples. There's nothing there. Your complaint is very cryptic. Well, it's a complaint before any discovery, Your Honor. But in an antitrust context, the Supreme Court's pretty clear that you have to have facts supporting your allegations. Well, we do have facts. We have facts that they maintained a litigation where they were able to offer no evidence that the finished products that were being sold contained the absolutely essential ingredient for infringement. If I could save a little time for rebuttal. Yes, you may save the rest of your time, Mr. Wallace. Mr. Taylor? Good morning, and welcome, Judge O'Malley. Thank you. I'd like to start by first clarifying the record with regard to some of what Mr. Wallace just said. It is wrong that AstraZeneca did not put on significant evidence on infringement on the alkaline reacting compound element in Mylan's product. All this court needs to do is refer to Judge Jones' very detailed opinion at 490F subsecond, pages 424 to 447. Twenty-three pages worth of analysis of AstraZeneca's evidence on Mylan's infringement. Well, that's exactly what your opponents are complaining about, isn't it? That you've got a procedural problem. You didn't ask for summary judgment in the alternative, and the judge never converted it into summary judgment. And under Chambers, you've got a bit of a problem with respect to the Second Circuit's strict analysis or strict application of the rule with respect to the obligation to convert. No, at the 12B6 stage, what Twombly says is you have to look at whether their pleading is plausible. And in this context, what the court should look at and what Judge Jones looked at is whether there is and there was an objective basis, an objective litigant would have understood throughout the course of this litigation that they may prevail at the end of the case. But by definition, you have to go outside the bounds of the face of the complaint. Well, that's a good point, Your Honor. There is no question that the court was entitled to look at the district court decision. What the case law says on this issue is that it's clearly permissible for the court to rely on the things that are pled or cited in the pleading, while the district court opinion is clearly cited in Mylan's pleading. It would be a very strange sham litigation allegation if the district court, looking at the soundness of that allegation, was prevented from looking at the very decision in the case. It's well beyond looking at the decision. I mean, she considered the totality of the entirety of that action as well as the other actions under her MDL umbrella. What she did, and she did that to some extent, but what she did was look at the summary judgment decision denying Mylan's summary judgment motion, which just about every SAM litigation case where the summary judgment has been decided looks at. So it's clearly permissible, and courts find, like Judge Jones did, that when a party has survived summary judgment, that's very, very strong evidence that the case was not a sham. And in this case, it's even stronger evidence because the arguments made at the summary judgment stage by Mylan are the very same arguments that they're making today, which they suggest renders AstraZeneca's litigation conduct a sham. What did they say at summary judgment phase? They said AstraZeneca is prevented from arguing that talc is an alkaline reacting compound. The court said no, they're not. They're entitled to argue that the talc that Mylan uses contains carbonates, and carbonates are alkaline reacting compounds as described in the claim. Mylan argued that the HPMC in its product was the same HPMC as used by a first wave defendant that was found not to infringe. They argued that point at the summary judgment stage. What did the court say? They said that AstraZeneca was entitled to, again, prove that the particular HPMC in Mylan's formulation was or could be in combination with the other elements in ARC. But did you present substantial evidence to go to that issue, to prove it? Those pages that I just cited from the district court decision contains the judge's consideration of the evidence that AstraZeneca put on on both those issues. And remember, Judge Jones, in deciding to dismiss Mylan's allegations of sham litigation, said that this was a close call. But her decision ultimately was exactly the same as the earlier decision, was it not? Oh, absolutely not. These issues were never presented in the earlier case. They simply were not. No first wave defendant had a formulation that relied on talc like Mylan did. It just didn't. No first wave defendant had a formulation that had the omeprazole containing this TEA like Mylan did. The Kutco formulation that Mylan stretches to argue that was the same as his was very different. That was a tablet formulation. Mylan's formulation was a capsule. In the Kutco formulation, the core was acidic. And the court relied on that heavily as a reason why AstraZeneca had not proven that their core contained an alkaline reacting compound. Mylan's core is alkaline. Astra presented evidence proving that every ingredient in the core had a pH over 7 and thus would stabilize omeprazole. Now, listen. We lost on that single issue at trial. No question. But that does not make this case a sham. Look back at the history of this litigation. At what point should AstraZeneca have been on notice that it would not prevail in the litigation when we had been prevailing on just about every issue throughout this entire proceeding until the court entered its final decision? When Mylan made its summary judgment motion in 2003, right after it had given us samples, the court said, no, excuse me, before it had given us samples. When it made its motion in 2003, before its motion, given us samples, the court said, it's premature. AstraZeneca is entitled to get samples of your product before you're entitled to summary judgment. And what did they argue then? The same arguments that they're making now. Talc precluded, HPMC precluded. They provided samples in 2003. AstraZeneca gave Mylan its testing evidence on those samples showing infringement in 2004 with its expert submissions. So from 2004, Mylan had evidence from AstraZeneca that those samples that it had provided us did infringe. 2006, Mylan makes another summary judgment motion. Again, arguing these same points on TEA and, excuse me, on talc and HPMC. Court denies Mylan's motion. Now, at what point should have Astra believed that its theories would not have been considered by the court and have a chance? In fact, we thought we had a good chance of prevailing at trial. So this case was simply not a sham. Could you address Judge O'Malley's first question to Mr. Wallace? Does perpetuating the case past certain point destroy your immunity? Well, we do believe that there is support for the position that a litigant who perpetuates a case knowing that it is baseless may face liability for sham litigation. Now, Mylan didn't put any claims on that in its brief. But you can see that there's case law. But it would not surprise me if there's case law, Your Honor, on that point. We did not challenge that point. Mr. Wallace is correct on that. But this case is not a close call on that issue. It just simply is not. Mylan, in fact, concedes that at the outset of the lawsuit, we had a reasonable basis to bring the case. What about the Orange Book filings? I mean, I know that you say that their complaint is inadequate because they don't say what was wrong, or the district court said that they didn't say what exactly was wrong with the Orange Book filings. But do you think that you could support a claim under the antitrust laws for improper Orange Book filings? Not the cursory summary allegation made by Mylan. There are a number of cases which we cite where those kinds of allegations that just, in summary fashion, say they filed patents in the Orange Book and that we did not like them. And therefore, they committed a violation. That doesn't meet their obligation to show under Twobly that this pleading was plausible. Now, Mr. Wallace did not address some of the other allegations that he has made. The automatic petitioning one, you alluded to that, I believe, Judge Rader. And you're right. AstraZeneca won 8 out of 10 of these cases. And then Mr. Wallace quickly said, but Astra was 0 and 3 in the cases where there was an ARC argument. Well, first of all, that argument was not made before the district court, the 0 and 3 argument, and it's wrong. Well, with respect to whether it was made before the district court, in fairness, he couldn't have known that the district court was going to use the batting average analogy or rely on the batting average cases until the district court did it, right? Well, Astra argued that in its papers. Okay. But he didn't argue it below. And it's wrong. In the first wave, one defendant, Cheminor, argued that they didn't meet the claim based on the alkaline reacting compound limitation. And you can find it at 222 F sub second, 518, 519. And if you look at those arguments, compare them to the arguments made by Mylan, they're somewhat similar. Cheminor said the patent. Did they use talc? No, they used another material called megalamine. But they argued that the claims and the disclosure of the patent. Did they have a Federal Circuit case against them, saying that you had to have an ARC and talc wasn't an ARC? A Federal Circuit case? There's no Federal Circuit case that says that in this proceeding. That talc issue hadn't been addressed in the first wave and had not been addressed by this Court of Appeals in the first wave decision. Talc had not been an issue. And get back to Cheminor. Cheminor said that because of megalamine was not described in the patent as an ARC, then their product could not infringe. The court did not agree with that argument and found in Astra's favor on infringement. And, you know, we've been talking about these arguments of non-infringement, like Mylan only alleged a single reason for non-infringement, and that this was what Astra should have been on notice that they cared about. Well, Astra was able to prove that Mylan infringed under every other element in the claims. And Mylan challenged some of those evidence. It wasn't only alkaline reacting compound they were arguing. They were arguing that they also didn't meet the subquoting limitations. They didn't have, we weren't able to prove enhanced stability. There were other arguments that they made on non-infringement that we prevailed on. Now, just because you lose on one issue, and there were many, many issues in this case, doesn't make this a sham. Just because you lose on one issue after prevailing on that same issue throughout the entire course of the litigation doesn't make this case a sham. And there was an invalidity counterclaim, correct? Yes, there was, and Astra prevailed on that as well. And I take it that Mylan did not propose to withdraw that counterclaim at any point in time? No, Your Honor, they did not. They tried that. Okay. Unless you have any other questions? Thank you, Mr. Taylor. Thank you. Mr. Wallace, you have a minute and a half or so. Thank you, Your Honor. Let me just address the ARC issue. AstraZeneca was maintaining there were three sources of ARC in the Mylan Esteve product. One was HPMC, and it turns out the HPMC that Mylan Esteve used is a proprietary product called Pharmacope 603. You can look it up in catalogs. It was exactly the same HPMC used in the Cutco product that Judge Jones says in 2002 was not an infringement, Federal Circuit affirmed. Mylan was using Talc, which is a commonly known inert excipient, which AstraZeneca and the European Patent Office back in the 1990s had represented is not an ARC. Their representation to the European Patent Office. That's why we were able to so carefully design around these patents to have a non-infringing product. The third source they alleged was the source of an ARC was TEA. TEA, and I do not know the long chemical name, and I couldn't pronounce it if you gave me a flash card, is one of the most highly toxic solvents around. It was used in a way upstream process to recrystallize the omeprazole. The FDA says you should get your TEA content as low as possible, if not get it out entirely. Their whole theory on TEA was supposition that if it was used in an upstream process, despite all the other stuff that goes on, it must survive. They had a machine that could measure TEA into the fractions of a part per billion. They used it on co-defendant lek. They said they never used it on our product, and they offered no evidence whatsoever that there was any measurable TEA left in the product. I see my red light on. Thank you, Your Honor. Thank you, Mr. Wallace. That concludes our morning.